**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ANTHONY OCHOA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 22-cv-2283 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION & ORDER</u>

Anthony Ochoa and his ex-girlfriend had a son, but their co-parenting relationship left a little something to be desired. She said that Ochoa flashed a gun at her – in front of their young son – in early September 2021. So she obtained an order of protection.

Things didn't go smoothly a week later when the time came for Ochoa's next scheduled visit. The ex-girlfriend wouldn't let Ochoa pick up their son. Ochoa wasn't surprised, but he was disappointed. And he wanted to do something about it. So he called the Chicago Police Department.

Ochoa's fateful decision to call the police started a chain of events that didn't end well. Officers Demetrio Muro and Jonathan Martinez met Ochoa on the street, down the block from his ex-girlfriend's place. Ochoa told them what happened, and when telling the story, he mentioned that his ex-girlfriend, Yesenia Rodriguez, had an order of protection against him.

The police then went down the street and spoke with Rodriguez. She told the police about the order of protection. She told the officers the backstory, too. She shared that Ochoa had flashed a gun at her when she picked up her son two weeks earlier.

She showed the officers a copy of the order of protection on her phone.  The order of protection required Ochoa to surrender any firearms.  At that point, the order of protection was only a few days old, and Ochoa had not yet received formal service.  So Rodriguez asked the officers to serve him with a copy.

The police then went back to Ochoa, and asked him if he owned any firearms.  He admitted that he had two handguns.  That revelation turned the tables.  Ochoa had set everything in motion by calling the police, but all of a sudden, Ochoa was playing defense.

The police told Ochoa that they needed to go to his house and get the guns in light of the order of protection.  Ochoa wasn't thrilled, but he complied.  But first, he needed to be served.  So an officer then went back to Rodriguez to get a hard copy of the order of protection so that they could formally serve him.

As they waited, an officer pressed Ochoa about how many guns he had.  Ochoa originally said that he had two handguns, but his description of his arsenal kept expanding.  He admitted that he had a 12-gauge shotgun.  And then he admitted that he had an (illegal) automatic rifle.  All told, Ochoa had four firearms at home.  He had a lot of firepower, but no right to have a firearm.

An officer came back with a hard copy of the order of protection, and a sergeant then served Ochoa.  At that point, Officers Muro and Martinez followed Ochoa to his residence.  Ochoa let the officers into his apartment, and then surrendered the firearms.  The officers took the weapons to the squad car, and then ran Ochoa's information through their computer system.

That's when Ochoa's day went from bad to worse to the worst.  The officers learned that Ochoa's Firearm Owner Identification ("FOID") card was revoked, meaning that he wasn't allowed to have firearms at all.  Owning a firearm without a FOID card violates state law.

So the officers went back to Ochoa's apartment.  They arrested Ochoa for possessing firearms without a valid FOID card.  Officer Muro prepared a criminal complaint alleging that Ochoa had committed a misdemeanor.  Ochoa spent the remainder of his evening in jail.

As it turned out, Ochoa's FOID card was revoked *because of the order of protection*. Ochoa later learned that, after notice of revocation, the FOID statute gives firearm owners 48 hours to surrender their weapons.  And here, Ochoa turned over his weapons right after the officers served him with the order of protection.

The misdemeanor charge against Ochoa was eventually dropped.  The criminal case was over, but the civil case was just getting started.

Ochoa believed that he got a raw deal by getting arrested for violating an order of protection right after getting served with the order of protection.  He believed that the officers should not have arrested him in the first place because the statute entitled him to a 48-hour grace period.  Ochoa filed a complaint with the Civilian Office of Police Accountability.

Ochoa then went to the federal courthouse and sued Officer Muro, Officer Martinez, and the City of Chicago.  He brought several claims under the Fourth Amendment and state law. After discovery, Defendants moved for summary judgment.  Defendants contend that Ochoa's claims fail on the merits, and that they are entitled to qualified immunity.

For the reasons that follow, Defendants' motion for summary judgment is granted.

## Background

Before diving into the facts, the Court makes an overarching observation.  If the background section seems long, that's because the background section is long.

To their credit, the parties rolled up their sleeves and submitted a detailed description of the facts that is rich with specifics.  The officers were wearing body-cams, too, and the

footage captured helpful details.[1]  At the end of the day, some of the facts might not be material, *see* Fed. R. Civ. P. 56(a), but the Court errs on the side of including the details in the interest of telling the full story.

## I.    The Police Response to Ochoa's Call

The story begins with a domestic dispute.  On the evening of September 10, 2021, Plaintiff Anthony Ochoa's ex-girlfriend, Yesenia Rodriguez, would not let him see their son. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 7, 11 (Dckt. No. 45).  So, he dialed the Chicago Police Department.  *Id.* at ¶ 6.

Officers Demetrio Muro and Jonathan Martinez responded to the call.  *Id.*  They arrived around 8:30 p.m.  *Id.*

Ochoa brought the officers up to speed.  He told the officers that Rodriguez would not let him see his son, in violation of their custody agreement.  *See* Martinez Video #1, at 2:15-28 (Dckt. No. 40-2); *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 8 (Dckt. No. 45).

Ochoa shared his theory about why Rodriguez had refused to let him see their son. Apparently, Ochoa and Rodriguez got into an argument the prior week.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 8 (Dckt. No. 45).  And Rodriguez had told Ochoa that she was "getting some order of protection bulls***."  *Id.*; *see also* Martinez Video #1, at 3:15-40 (Dckt. No. 40-2).

The officers told Ochoa that they would go talk to Rodriguez.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 9 (Dckt. No. 45).  Before they left, Ochoa asked if he could leave his car where it was parked.  *Id.*  Officer Martinez said yes.  *Id.*  In fact, Officer Martinez suggested that

---

[1] Defendants submitted links to video footage as a "digital exhibit."  *See* Digital Ex. (Dckt. No. 43).  The Court's pin cites start at 0:00 (and are not based on the timestamps that appear in the righthand corner of the body-camera footage).  So, if something happened 5 minutes and 45 seconds into the clip, the Court's citation would start at 5:45, not at whatever timestamp displays on the righthand side of the video.

Ochoa just stay in the car, because he didn't "want a confrontation" between Ochoa and Rodriguez.  *Id.*; *see also* Martinez Video #1, at 3:50-58 (Dckt. No. 40-2).

      Officer Martinez confirmed Rodriguez's name and address.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 10 (Dckt. No. 45).  Then, Officers Muro and Martinez walked a short distance to Rodriguez's home.  *See* Martinez Video #1, at 3:50 – 5:28 (Dckt. No. 40-2).  They saw where the house was, and then walked back Ochoa.

      Body-cam footage shows that the officers spoke with Ochoa next to his car, which was parked near Rodriguez's home – but not directly outside it.  *See* Martinez Video #1, at 2:20 – 3:50 (Dckt. No. 40-2).  The body-cam footage shows that the officers met Ochoa about a block from Rodriguez's home.  *Id.* at 3:50 – 8:20.

      Officer Martinez estimated the distance from Ochoa's car to Rodriguez's home as between 20–25 feet.  *See* Martinez Dep., at 14 (Dckt. No. 47-1, at 6 of 37).[2]  Officer Muro testified that Ochoa's car was "[m]aybe several houses away" from Rodriguez's home (on the same block.).  *See* Muro Dep., at 16:24 – 17:11 (Dckt. No. 47-3, at 6 of 37).  Ochoa gave a similar estimate.  *See* Ochoa Dep., at 34:12-17 (Dckt. No. 47-4, at 11 of 54).  So, they were close by.  But the officers did not meet Ochoa *directly* outside Rodriguez's home.

      After telling Ochoa to stay put, Officers Muro and Martinez drove to Rodriguez's home (it was a short little drive).  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 10 (Dckt. No. 45).  They connected with Rodriguez and heard her side of the story.

---

[2]  The complete transcript of Officer Martinez's deposition, provided by Ochoa, does not include line numbers.  *See generally* Martinez Dep. (Dckt. No. 47-1).  Thus, while the Court uses page and line numbers when quoting the deposition testimony of Officer Muro and Ochoa, it uses only the page number when referencing Officer Martinez's deposition transcript.

Rodriguez explained that she had an order of protection against Ochoa. *Id.*; *see also* Martinez Video #1, at 8:20-24 (Dckt. No. 40-2). Rodriguez explained that the order "covers me and my son," and asked the officers if they wanted to see the order. *Id.* at 8:25-35.

One of the officers asked Rodriguez about the custody arrangement. *Id.* at 8:50-54. Rodriguez explained that Ochoa typically had their son every other weekend. *Id.* at 8:54-58. But Rodriguez said that when she went to pick up her son two Sundays ago, Ochoa "flashed a firearm" at her and her partner, with her son "in the vehicle." *Id.* at 9:00-16.

Rodriguez then handed Officer Martinez her cell phone, which apparently displayed the order of protection. *Id.* at 9:55.[3]

The order of protection was entered a week earlier, on September 3, 2021. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 11 (Dckt. No. 45). But Rodriguez told Officers Muro and Martinez that no one had served Ochoa yet, and she asked the officers if they could serve him. *See* Martinez Video #1, at 11:11-20 (Dckt. No. 40-2).

The officers responded that they lacked the authority to serve Ochoa. But a sergeant (a higher-ranking officer) could serve him. *Id.*

---

[3] Ochoa admits that Rodriguez showed Officer Martinez *something* on her phone, but he contests that it was an order of protection. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 11 (Dckt. No. 45). The body-cam footage shows that Officer Martinez scrolled through a document on Rodriguez's phone. *See* Martinez Video #1, at 9:55 – 10:00 (Dckt. No. 40-2). While holding Rodriguez's phone, Officer Martinez appears to read out loud from an order of protection – he says the words "harassment, physical, abuse, stalking, intimidation of a dependent," says that an individual was "ordered to stay away," and says "petition is granted." *See id.* at 10:25-49. Officer Martinez later can be heard telling Officer Muro that the order went "through the 24th of September." *See id.* at 11:50-52. Officer Martinez told his sergeant that he had reviewed an order of protection on Rodriguez's phone, too. *Id.* at 24:57 – 25:30. And Officer Martinez returned to Rodriguez's home later to ask her for copies of the order – or if he could borrow her phone to show the order to the sergeant and Ochoa. *Id.* at 36:00 – 40:32. Rodriguez printed a couple hard copies for Officer Martinez, but she didn't have a hard copy when he came to the door. *Id.* So, Rodriguez had a digital copy of the order of protection, which the officers reviewed. Nonetheless, the body-cam did not get a clear shot of Rodriguez's phone screen during the initial interaction.

Rodriguez mentioned to the officers that the order of protection required Ochoa to surrender his firearms. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 11 (Dckt. No. 45).

One of the officers asked Rodriguez if Ochoa had firearms. Rodriguez responded that he did. In fact, that's why she got the order of protection in the first place. Rodriguez reiterated that she had "[seen] them when he tried to flash it." *See* Martinez Video #1, at 11:55 – 12:04 (Dckt. No. 40-2).

Illinois requires firearm owners to obtain a Firearm Owner Identification ("FOID") card. *See* 430 ILCS 65/1 *et seq.* Rodriguez said that she believed that Ochoa had a FOID card. *See* Martinez Video #1, at 12:55 – 13:03 (Dckt. No. 40-2). She said that she wasn't sure whether Ochoa carried firearms regularly. *Id.* at 13:04-10.

The officers asked again about the requirement that Ochoa surrender his firearms. *Id.* at 13:40-50. Rodriguez pointed them to provision "14.5" of the order of protection, which one of the officers read off her phone. *Id.* The provision required Ochoa to "surrender any and all" firearms. *Id.* The officers then handed the phone back to Rodriguez. *Id.* at 13:58.

Officers Muro and Martinez got back in their car and drove to where Ochoa was parked. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 13 (Dckt. No. 45). He was nearby. After pulling up next to Ochoa, Officer Martinez asked Ochoa if he had any firearms. *Id.* at ¶ 14; Martinez Video #1, at 18:13 (Dckt. No. 40-2).

Ochoa answered that he did. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 14 (Dckt. No. 45). He said that he owned "two" firearms. *Id.* But Ochoa said he did not have any firearms with him. *See* Martinez Video #1, at 18:18-21 (Dckt. No. 40-2). Ochoa added that Rodriguez was "saying that I pulled it [a firearm] out or something like that which is not true." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 14.

Officer Martinez then explained that Rodriguez had obtained an order of protection against Ochoa. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 2 (Dckt. No. 53). But Ochoa hadn't been served yet. *Id.* Officers Muro and Martinez planned to send a sergeant over to serve Ochoa then and there. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 15 (Dckt. No. 45).

Ochoa replied that he "was going to go do that tomorrow," and that his lawyer "was going to go downtown to pick [the order of protection] up." *Id.* Officer Martinez said that the order of protection was already in the system, so a sergeant would serve Ochoa immediately. *Id.* at ¶ 16.

Officer Martinez added that Ochoa needed to surrender the guns right away. He told Ochoa that, after the sergeant served Ochoa, he and Officer Muro would go to Ochoa's home, where Ochoa kept his guns. And then, Ochoa would have to surrender the firearms "based on the order of protection." *See* Martinez Video #1, at 19:05-12 (Dckt. No. 40-2). But Officer Martinez said that Ochoa would get his "guns back" after the order of protection lifted. *See id.* at 19:38-43.

Ochoa wasn't satisfied. He told Officer Martinez: "I've done that before and it took like months and it cost a lot of money and all for some bulls*** protection."[4] *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 16 (Dckt. No. 45); Martinez Video #1, at 19:44-52 (Dckt. No.

---

[4] When Ochoa said that he had "done this before," he meant that he had "turned in [his] firearms" previously. *See* Ochoa Dep., at 66:16-19 (Dckt. No. 47-4, at 19 of 54). On a prior occasion, police officers "came to [Ochoa's] house due to another incident; and while they were there, they took the case with [his] firearms in it." *Id.* at 67:1-3. Zooming out, Ochoa stated that his FOID card was revoked twice before the incident in question, based on orders of protection. *Id.* at 50:22 – 51:3. Ochoa explained that those orders of protection were filed by two of Rodriguez's friends. *Id.* at 51:4 – 52:3. Ochoa added that Rodriguez had "tried to file some before as well; however, my FOID was not revoked for those. I don't know why." *Id.* at 51:20-22.

40-2).  Ochoa asked about his son, and Officer Martinez replied that "this order of protection does overtake . . . your child support stuff."  *See* Martinez Video #1, at 19:53 – 20:04.

Once again, Officer Martinez explained that a sergeant would come and serve Ochoa.  *Id.* at 20:36-43.  Ochoa wasn't excited about that prospect.  He inquired:  "Can I just like leave and forget about this and just get served because this is just like wasting time."  *Id.* at 20:45-50; *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 17 (Dckt. No. 45).

Officer Martinez replied:  "So, we're here.  It's all on camera."  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 17 (Dckt. No. 45); Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 4 (Dckt. No. 53); Martinez Video #1, at 19:50-53 (Dckt. No. 40-2).  Ochoa responded:  "I understand.  This is just ridiculous."  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 17; Martinez Video #1, at 19:53-54.

Officers Muro and Martinez did not tell Ochoa that he was free to leave.  *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 4 (Dckt. No. 53).  They did not tell Ochoa that he *couldn't* leave, either.  But Ochoa testified that he "thought it was implied because [he] asked to leave."  *See* Ochoa Dep., at 63:5-14 (Dckt. No. 47-4, at 18 of 54).

Officer Martinez explained that he empathized with Ochoa.  He had a child custody arrangement for his own daughter, so he "g[o]t it."  *See* Martinez Video #1, at 21:00-13 (Dckt. No. 40-2).  But "the best thing [Ochoa] could do" until the order of protection lifted, Officer Martinez advised, would be to stay away from his son, because Ochoa wouldn't "want to put his kid through all that stuff."  *Id.* at 21:20-30.

Again, Ochoa told the officers that he had two handguns, and he asked if he could bring them out in a case.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 18 (Dckt. No. 45).  Officer Martinez explained that he and Officer Muro "were going to go in" Ochoa's residence with

Ochoa. *Id.*; *see also* Martinez Video #1, at 22:00-13 (Dckt. No. 40-2). Ochoa replied that he had "done this before" – meaning that "the police came to [his] house" previously, and he gave officers his firearms. *See* Martinez Video #1, at 22:13-21.

Up to that point, Ochoa had twice told Officers Muro and Martinez that he had two firearms. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 14, 18 (Dckt. No. 45). But Officer Martinez apparently was skeptical and asked Ochoa: "Is that all you have? Be honest." *See* Martinez Video #1, at 22:30-35 (Dckt. No. 40-2); *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 19.

Ochoa admitted that he also had a "12-gauge," meaning a shotgun. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 19. Martinez replied that "obviously" the police would "need to take that, too." *See* Martinez Video #1, at 22:36-38.

Officer Muro then asked if Ochoa "ha[d] anything in the car." *See* Martinez Video #1, at 22:40-43 (Dckt. No. 40-2). Ochoa said that he did not. *Id.* Officer Muro inquired: "You don't mind if I look?" *Id.* at 22:44-45; *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 20 (Dckt. No. 45). Ochoa replied, "No, of course." *See* Martinez Video #1, at 22:45; *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 20; Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 7 (Dckt. No. 53).

While Officer Muro searched the vehicle, Officer Martinez gave Ochoa a tip to avoid future "allegations" from Rodriguez: record their in-person interactions on his cellphone. *See* Martinez Video #1, at 22:46 – 24:17 (Dckt. No. 40-2). Officer Muro looked around the car with a flashlight but didn't find anything. *See* Muro Video #1, at 22:50 – 24:35 (Dckt. No. 40-5).

After Officer Muro finished searching the car, Ochoa voluntarily lifted his shirt, showing his waist, and asked if the officers wanted to search his person. *See* Pl.'s Resp. to Defs.'

10

Statement of Facts, at ¶ 21 (Dckt. No. 45). The officers had express permission to search Ochoa's person for weapons. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 7 (Dckt. No. 53). Ochoa said that he had a pocketknife, which Officer Martinez put in the rear of Ochoa's car. *See* Martinez Video #1, at 24:35-45 (Dckt. No. 40-2).

While Officer Muro continued searching Ochoa's person, Officer Martinez excused himself to call his sergeant, Sergeant Casale.[5] *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 22 (Dckt. No. 45). Officer Martinez informed the sergeant that, after Ochoa was served, he and Officer Muro planned to follow Ochoa to his house because "based on the order that [he] read off [Ochoa's] baby mama's phone," Ochoa had to "give up all his guns, and he has three guns." *See* Martinez Video #1, at 24:57 – 25:30 (Dckt. No. 40-2).

Officer Muro finished the search of his person without incident. *See* Muro Video #1, at 24:45 – 25:15 (Dckt. No. 40-5). Officer Martinez rejoined the conversation after talking to the sergeant, and he suggested that Ochoa look up information that could "significantly reduce" his child support payments. *See id.* at 26:55 – 27:35.

Officer Martinez listed the weapons that Ochoa claimed to own – two pistols and a 12-gauge. And then he asked, "Anything else?" *See* Martinez Video #1, at 29:00-25 (Dckt. No. 40-2); Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 24 (Dckt. No. 45). Ochoa answered: "Ammunitions, magazines, stuff like that." *See* Martinez Video #1, at 29:26-35; *see* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 24. Officer Martinez said he thought that the officers would need to take "that stuff," and Ochoa replied, "For f***'s sake." *See* Martinez Video #1, at 29:30-35.

---

[5] Sergeant Casale's first name does not appear in the record.

Ochoa then asked if the officers were going to "tear apart his room." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 24 (Dckt. No. 45). Officer Martinez said that the officers would have Ochoa point out the location of his guns and ammunition. *Id.* The officers would then "grab it" and "go from there." *See* Martinez Video #1, at 29:49-53 (Dckt. No. 40-2).

Recall, Ochoa initially told the officers that he had two firearms. Then, he upped that number to three. Officer Martinez asked a foreseeable follow-up question: "Besides the two [hand]guns and the shotgun, anything else?" *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 25 (Dckt. No. 45); *see also* Muro Video #1, at 29:50-55 (Dckt. No. 40-5). Officer Martinez warned Ochoa to "be honest, man. It could bite you in the a**." *See* Muro Video #1, at 29:57 – 30:01.

Ochoa blurted out the opinion that it was "not against the law to own an AR." And then, Ochoa admitted that he owned an automatic rifle. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 25 (Dckt. No. 45); Muro Video #1, at 30:01-10 (Dckt. No. 40-5).

Officer Martinez corrected his misimpression about the legality of automatic weapons. He explained that, under a Chicago ordinance, "you cannot own an AR." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 25; Muro Video #1, at 30:11-17.

Ochoa stated that when he purchased the gun, a gun shop employee told him that it was legal to own an AR in Chicago – it was "just an ordinance." *See* Martinez Video #1, at 30:30-34 (Dckt. No. 40-2). Officer Muro explained that, while AR-style weapons were legal under state law, they were illegal to possess in certain "towns," including Chicago. *Id.* at 31:00-06.

Since 2013, Chicago's municipal code has prohibited city residents from buying, carrying, or possessing certain semiautomatic weapons and large-capacity magazines. *See* Chicago Mun. Code §§ 8-20-010(a)(10)(B), 8-20-075, 8-20-085. At the time of Ochoa's arrest, the municipal code provided for a $1,000 to $5,000 fine, and incarceration "for a term of not less

than 90 days nor more than 180 days" for individuals found in unlawful possession of an assault weapon. *See* Chicago Mun. Code § 8-20-300(a). Similarly, Cook County (where Chicago sits) has barred residents from buying, carrying, or possessing certain semiautomatic rifles and large-capacity magazines since 2006. *See* Cook County Code §§ 54-211(7)(A)(iii), 54-212(a).

Ochoa asked if he would be arrested for having the AR, and Officer Muro said no. *See* Muro Video #1, at 31:00-10 (Dckt. No. 40-5). Officer Martinez then stated: "For some reason, I had a feeling, about an AR. Especially an avid, avid person." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 26 (Dckt. No. 45); Martinez Video #1, at 31:36-48 (Dckt. No. 40-2).

Officer Martinez told Ochoa that, given the severity of Rodriguez's accusations, he was "surprised" that she didn't request that Ochoa be arrested. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 27 (Dckt. No. 45); Martinez Video #1, at 33:40 – 34:00 (Dckt. No. 40-2).

Ochoa agreed with Officer Martinez. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 27 (Dckt. No. 45). He explained that he had received an email (on an unspecified date) that said something like "Your FOID has been changed." *Id.* So, Ochoa asked his attorney to investigate. *Id.* And the lawyer reported back that there was "an order against" Ochoa – which he planned to pick up on Ochoa's behalf. *Id.*

At this point, Sergeant Casale showed up to serve Ochoa with the order of protection. *Id.* at ¶ 28. Officer Martinez gave Ochoa's driver's license to Sergeant Casale. *Id.* Officer Martinez then walked to Rodriguez's home, and got a hard copy of the order of protection from Rodriguez. *See id.*; *see also* Martinez Video #1, at 36:00 – 40:32 (Dckt. No. 40-2).

Officer Martinez gave Sergeant Casale a copy of the order. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 29 (Dckt. No. 45). Officer Martinez asked Sergeant Casale if he and Officer Muro should get "all the ammo, everything?" *Id.* Sergeant Casale said yes. *Id.*

In the meantime, Ochoa and Officer Muro made small talk. Officer Muro learned about Ochoa's job at Lou Malnati's, that he had earned 80 college credit hours, and that he wanted to become a police officer. *Id.* at ¶ 23.

Sergeant Casale then served Ochoa with the order of protection and explained how the order worked. *Id.* at ¶ 30; *see also* Muro Video #1, at 47:30 – 48:29 (Dckt. No. 40-5). Once again, Officer Martinez informed Sergeant Casale that he and Officer Muro planned to follow Ochoa to his house to pick up the firearms. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 30 (Dckt. No. 45); *see also* Muro Video #1, at 48:30-50. "No one object[ed] to this planned course of action." *See* Pl.'s Resp. to Defs' Statement of Facts, at ¶ 30.

Officer Martinez walked back to Rodriguez's house and told her that Sergeant Casale had served Ochoa with the order of protection. *Id.* at ¶ 33; *see also* Martinez Video #1, at 49:30 – 50:00 (Dckt. No. 40-2). Officer Martinez then returned to where Ochoa and Officer Muro were standing (near Ochoa's car) and reiterated that the officers would follow Ochoa to his home. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 34 (Dckt. No. 45); Martinez Video #1, at 52:38-51.

Ochoa admits that Officers Muro and Martinez "did not use force against [Ochoa], display their weapons, or threaten to use their weapons when communicating with [Ochoa]." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 31 (Dckt. No. 45). Officers Muro and Martinez never blocked Ochoa's vehicle. *Id.* at ¶ 32. Ochoa consented to the search of his car, and his person. *Id.* at ¶¶ 20–21, 32; *see also* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 7 (Dckt. No. 53).

14

## II.     The Apartment Entry

As planned, Officers Muro and Martinez followed Ochoa to his residence.  They arrived at an apartment complex with multiple residential units.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 35 (Dckt. No. 45).

Ochoa lived in a two-story apartment building.  The front of the building had a door with a common entrance.  The common entrance at the front of the building had two doors.  It had a glass and metal security door that swung out.  It also had a wood main door, which swung in.  So, to get in the building, someone would need to open two doors.

After entering the building, there was another door immediately on the left, presumably someone else's apartment.  A small flight of stairs was only a few steps away.  After going up half a dozen stairs, Ochoa's apartment was on the left.

Before they went inside the apartment building, Ochoa asked the officers if he could put his dog in the bathroom.  *Id.*  Officer Muro said yes – but he told Ochoa that "we [Officers Muro and Martinez] are going to follow you though."  *Id.*  Ochoa said that was "fine."  *Id.*

The officers knew that there was no arrest warrant out for Ochoa.  *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 9 (Dckt. No. 53).  They knew that they did not have a search warrant authorizing them to search the house.  *Id.*  They also knew that the order of protection did not give them authority to enter Ochoa's home.  *Id.*

Ochoa unlocked the exterior door of the building.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 36 (Dckt. No. 45).  Officers Muro and Martinez followed him inside.  *Id.*  Ochoa walked upstairs, followed by Officer Muro, and then by Officer Martinez.  *Id.* at ¶ 38.  They walked up the stairs together, and Ochoa opened the door to his unit.  *Id.*

15

But Ochoa did not open the door all the way, meaning at a 90-degree angle. *See* Martinez Video #2, at 2:40-49 (Dckt. No. 40-3). Instead, he opened the door approximately halfway, at about a 45-degree angle. *Id.* at 2:46-48. Ochoa then walked inside, through the half-open door. *Id.*

After Ochoa entered the unit, he left the door in the same position as when he walked through it – *i.e.*, partly, but not fully, opened. *See* Martinez Video #2, at 2:46-49 (Dckt. No. 40-3). The door was *never* fully opened, even when Ochoa walked through it. *Id.* Ochoa admits that he "did not completely close the door in Officer Muro's face," but he claims that he "partially closed it." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 38 (Dckt. No. 45).

Ochoa left the front door to his apartment half open, and Officers Muro and Martinez walked right in to the apartment. *Id.* at 2:50-57. The officers did not ask for permission to follow Ochoa. *Id.* They did not open the door at a wider angle, either. *Id.* They slipped through the half-open door, as Ochoa had moments earlier. *Id.*

Inside the unit, Ochoa opened the door to his bedroom, and Officers Muro and Martinez followed him in. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 39 (Dckt. No. 45). Before they entered, Ochoa warned the officers that the room was "a mess," explaining that he only had "time to sleep and work." *See* Martinez Video #2, at 3:05-14 (Dckt. No. 40-3).

Inside the bedroom, Officers Muro and Martinez instructed Ochoa to sit on his bed and point to the location of his firearms and ammunition. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 40 (Dckt. No. 45). Ochoa complied. *Id.*

Officer Martinez recovered two handguns, a pump-action shotgun, an assault rifle, ammunition, and high-capacity magazines for the assault rifle. *Id.*; *see also* Martinez Video #2, at 3:45 – 9:00 (Dckt. No. 40-3). Officer Martinez called Sergeant Casale and confirmed that

Ochoa could keep his firearm cases – but not the magazines.  *See* Martinez Video #2, at 6:58 –
8:13.

The officers placed Ochoa's firearms, ammunition, and magazines into plastic bags
(which Ochoa provided) for transport.  *See id.* at 9:00 – 12:08.  Officer Martinez explained that
the officers planned to go to the station and inventory the items.  *Id.* at 13:05-20.  Officer Muro
added:  "There's nothing criminal. You're the possessor of these firearms, and the case reporter's
just gonna state that an order of protection was served on you. . . . So they're just being held
because you can't have them."  *Id.* at 13:28-50; *see also* Defs.' Resp. to Pl.'s Statement of
Additional Facts, at ¶ 16 (Dckt. No. 53).

Ochoa seemed relaxed, and he cooperated.  By the look and the sound of things, the
atmosphere did not seem tense.

As the officers reached the apartment door, Officer Martinez asked Ochoa for his driver's
license and FOID card.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 42 (Dckt. No. 45);
Martinez Video #2, at 14:02-10 (Dckt. No. 40-3).  Ochoa handed over his driver's license and
FOID card.  Officer Martinez photographed both and handed them back to Ochoa.  *See* Pl.'s
Resp. to Defs.' Statement of Facts, at ¶ 42; Martinez Video #2, at 14:15-45.

After confiscating the weapons, Officers Muro and Martinez returned to the squad car.
*See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 43 (Dckt. No. 45).  The officers ran Ochoa's
FOID card through the car's computer system.  *Id.* at ¶ 44.

That's when things went sideways.  The officers learned that Ochoa's FOID was
revoked.  *Id.* at ¶ 45; *see also* Muro Dep., at 29:2-19 (Dckt. No. 47-3, at 9 of 37).

So, Officer Martinez called Sergeant Casale and explained that he and Officer Muro
planned to arrest Ochoa for possessing firearms without a valid FOID card.  *See* Pl.'s Resp. to

17

Defs.' Statement of Facts, at ¶ 46 (Dckt. No. 45); *see also* Muro Dep., at 30:7 – 32:2 (Dckt. No. 47-3, at 10 of 37).

The officers did not know when Ochoa's FOID card was revoked. They did not attempt to learn this information. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 18 (Dckt. No. 53).

## III.    The Arrest of Ochoa

After speaking to the sergeant, Officers Muro and Martinez returned to Ochoa's apartment building. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 46–47 (Dckt. No. 45). They returned less than five minutes after leaving Ochoa's apartment. *Id.*

The common door to the apartment building typically would have been locked. But the entrance to the building was unlocked, and the officers entered the building. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 20 (Dckt. No. 53); *see also* Ochoa Dep., at 106:3-14 (Dckt. No. 47-4, at 29 of 54).

The officers went up the stairs, and Officer Muro knocked on the door of Ochoa's unit. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 20 (Dckt. No. 53). He told Ochoa that it was the police. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 48 (Dckt. No. 45). But the officers did not tell Ochoa that they planned to arrest him. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 25 (Dckt. No. 53). The officers did not think that an emergency required them to enter Ochoa's unit. *Id.* at ¶ 31.

Ochoa opened the door to his apartment, and Officer Martinez asked Ochoa to put his dog away. *Id.* at ¶ 49  Ochoa replied, "She's just sitting there." *Id.* Officer Muro asked Ochoa again to put the dog away, and Ochoa agreed. *Id.*

18

Ochoa then closed the door to his apartment, or *nearly* closed the door, while he dealt with the pooch. *See id.* at ¶ 50; Martinez Video #3, at 2:30-47 (Dckt. No. 40-4). In the meantime, Ochoa closed the door more firmly than when the officers entered earlier that night. *See* Martinez Video #3, at 2:30-47 (Dckt. No. 40-4).

The parties disagree about whether Ochoa completely closed the door. Ochoa says that he closed the door completely. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 50 (Dckt. No. 45). But Officer Muro claims that there was "space between the door and the frame." *See* Muro Dep., at 34:8 – 35:22 (Dckt. No. 47-3, at 11 of 37).

After watching the video, the door looks closed. A person could not walk through the doorway, without moving the door. A dog couldn't fit through the gap, either. At first glance, it might not be obvious whether Ochoa completely closed the door.

But a close inspection reveals that the door wasn't closed all the way (but it was close). At the beginning of the video, before the officer knocked on the door, you can see the door shut. It shows a strip of wood at the bottom of the door. The angle of the door is the same as the angle of the wood on the floor. The bottom of the door is parallel to the wood trim.

But after Ochoa opened the door, and then (mostly) shut the door to take care of the dog, the angle of the door is different. The door was not flush with the door frame. That is, looking at the bottom of the door frame, you can see that there is more exposed wood than when the door was entirely shut. For example, compare the picture of the door and the door frame at the moment when the door is shut and the moment when the door is mostly closed. *Compare* Martinez Video #3, at 2:23 (Dckt. No. 40-4), *with id.* at 2:24.

By the look of things, the door was not completely shut.  But it was close.  It was open just a smidge – like what you might do while grabbing your wallet after saying hello to the pizza delivery guy.

In any event, Ochoa did not lock the door while he dealt with his dog.  *Id.* at ¶ 50.

At that point, Ochoa was inside the apartment, dealing with the dog.  And the officers were outside the apartment, waiting to be let in.

They waited less than 10 seconds.  And then, Officer Muro softly pushed the door, with just a little push.  He gently pressed the door, using only his fingertips.  *See* Martinez Video #3, at 2:45-53 (Dckt. No. 40-4).  It swung open.

Officer Muro did not touch the doorknob when he opened the door.  So the latch was not engaged, and the doorknob did not need to be turned.  The door was open just a smidge, and needed just a little gentle push to get opened.

At that point, the officers entered Ochoa's apartment.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 51 (Dckt. No. 45); *see also* Martinez Video #3, at 2:38-57 (Dckt. No. 40-4).

Officer Martinez asked "Good?" before the officers entered.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 51.  The officers contend that Ochoa replied "yeah," while Ochoa thinks he said, "hold on."  *Id.*; *see also* Martinez Video #3, at 2:49-52 (Dckt. No. 40-4); Ochoa Dep., at 109:8 – 110:11 (Dckt. No. 47-4, at 29–30 of 54).

After listening to the recording, the Court heard what sounds like a muffled "yeah."  *See* Martinez Video #3, at 2:49-52.

Officer Martinez told Ochoa that his FOID card was revoked, and Ochoa replied:  "Yeah, because of this."  *See* Martinez Video #3, at 2:59 – 3:04 (Dckt. No. 40-4).[6]  Officer Martinez told

---

[6]  Ochoa denies making this statement in his response to Defendants' statement of facts.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 52 (Dckt. No. 45).  However, Ochoa does not offer evidence disputing

Ochoa that they had to arrest him.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 52 (Dckt. No. 45).

Ochoa was in disbelief.  He asked Officer Martinez, "Are you serious?"  *See* Martinez Video #3, at 3:07-08 (Dckt. No. 40-4).

Ochoa asked how he was supposed to know that his FOID card was revoked, given that the order of protection was served earlier that night.  *Id.* at ¶ 53.  Ochoa reminded the officers that he had received an email stating that "something was changed" with his FOID status.  *See* Martinez Video #3, at 3:10-24 (Dckt. No. 40-4).  But according to Ochoa, it didn't give the details.  Ochoa asked how he would have known that the FOID card was revoked when the officers had just served him with the order of protection.  *Id.* at 3:30-35.

Officer Martinez responded that the email gave Ochoa notice about the revoked FOID card.  *Id.* at 3:34-38; *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 53 (Dckt. No. 45).  And then, Ochoa tried to show the officers the email.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 54; *see also* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 22 (Dckt. No. 53).

Taking a step back, Ochoa received an email from the Illinois State Police on the morning of September 8, 2021 (two days before this incident).  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 55 (Dckt. No. 45).  The email stated:  "There has been a status change to your Firearm Owners Identification card.  Please log in to your account at ispfsb.com.  A letter will also be forthcoming through US mail."  *Id.*

---

this fact.  *Id.*  Further, Ochoa admitted to making this statement at deposition.  *See* Ochoa Dep., at 110:17-19 (Dckt. No. 47-4, at 29–30 of 54) (Q:  "One of the police officers told you your FOID was revoked, and how did you respond?"  A:  "Yes, because of this.").

At the time of the arrest, Ochoa had not yet received that letter. The letter about the FOID card revocation was dated September 8 and postmarked September 10. It apparently arrived later that week, meaning after Ochoa was arrested. *See* ISP Letter (Dckt. No. 47-7).

Ochoa testified that he attempted to log in to the Illinois State Police website after getting the email, but was unsuccessful. *See* Ochoa Dep., at 46:8 – 50:16 (Dckt. No. 47-4, at 14–15 of 54). "I couldn't log in to the website." *Id.* at 46:19-20.

That testimony sits uncomfortably with the log-in records from the Illinois State Police. At deposition, counsel showed Ochoa an exhibit showing his "history of log-ins and visits to the State Police website." *Id.* at 48:24 – 49:1. The record came from the Firearm Services Bureau of the Illinois State Police. *Id.* at 49:10-13.

When you log in to the Applicant Portal on the Illinois State Police website, it takes you to a page called the "Dashboard." *See https://www.ispfsb.com/LH/Dash.aspx.* At that point, there are two large blue headers. The first blue header is the "APPLICATION SUMMARY," and contains the personal information about the card holder. Below, the second blue header says "FIREARM OWNER'S ID CARD." *Id.* And right below, it says "Status." *Id.* If the card is valid, it says "Active."[7] *Id.*

The deposition exhibit from the Illinois State Police showed that Ochoa visited his Dashboard five times – in fewer than seven minutes – on the day that he received the email about the change in FOID status. *See* Ochoa Dep., at 48:1 – 50:20 (Dckt. No. 47-4, at 14–15 of 54). He visited the Dashboard for the first time at 5:40 p.m. on September 8, 2021, and visited the Dashboard for the fifth time at 5:47 p.m. But Ochoa testified that he could not log in, despite what the document suggested.

---

[7] The Court can take judicial notice of the content of a website of a state agency, including what the Dashboard looks like for a local jurist.

In any event, Ochoa tried to show the officers the email, but Officers Muro and Martinez did not review it. Officer Muro explained that they were arresting Ochoa for possessing firearms without a valid FOID card. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 58 (Dckt. No. 45). Officer Martinez told Ochoa that the officers had to call the State's Attorney to tell the prosecutors about the situation. *Id.* at ¶ 59.

Officer Martinez then explained to Ochoa's mother (over the phone, in a mix of English and Spanish) that Ochoa's FOID card was revoked. *Id.* at ¶ 60. Ochoa said it was revoked "because of this," meaning because of the order of protection. *Id.*

Officer Martinez responded that they didn't know *why* the FOID card was revoked. He explained: "That is the thing. We don't know if it is because of this. It just says 'Revoked.'" *Id.* Officer Martinez said that he and Officer Muro would call Ochoa's mother from the station and explain what was going on, so that she wouldn't worry. *Id.* at ¶ 61.

Officers Muro and Martinez allowed Ochoa to change clothes, and instructed him about what to bring to the station. *Id.* at ¶ 62. Throughout his interactions with the officers at his home, Ochoa never said "that he wanted the officers to leave his apartment." *Id.* at ¶ 65.

After Ochoa changed clothes, the officers walked him to the squad car and put him in handcuffs. *Id.* at ¶ 63. Officer Martinez told Ochoa to look at the computer screen in the car, so that he could see for himself that his FOID card was revoked. *Id.* at ¶ 64. Ochoa saw that it was revoked and said, "I believe you. I believe you." *Id.*

Officers Muro and Martinez spoke with Sergeant Casale before each of the two entries into Ochoa's home. *Id.* at ¶¶ 30, 46. However, Chicago Police Department policy requires officers seeking to conduct a consensual search of a residence to obtain written consent to search. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 39 (Dckt. No. 53); *see also* CPD

Special Order S04-19-01 (Dckt. No. 47-1).  The policy also requires officers to have a supervisor (meaning, a sergeant) present for the search.  *Id.*

Officers Muro and Martinez kept Sergeant Casale apprised of their plans, but Sergeant Casale was not present for the search.  *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 39 (Dckt. No. 53).  Ochoa did not complete a consent-to-search form, either.  *Id.*

## IV.    The Charges

Officers Muro and Martinez jointly decided to charge Ochoa with a misdemeanor (meaning a violation of state law), instead of a violation of the City of Chicago ordinance (local law).  *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 32 (Dckt. No. 53).  They did not consult with Cook County Assistant State's Attorneys before making that decision.  *Id.*

Officer Muro signed the misdemeanor complaint.  The complaint alleged that Ochoa had violated the Firearm Owners Identification Card Act, 430 ILCS 65/2(a)(1), by possessing the four firearms removed from his apartment without a valid FOID card.  *Id.* at ¶ 33; *see also* Crim. Cplt. (Dckt. No. 47-2).

The statutory provision cited in the criminal complaint requires Illinois firearm owners to have a valid FOID card.  It provides:  "No person may acquire or possess any firearm, stun gun, or taser within this State without having in his or her possession a Firearm Owner's Identification Card previously issued in his or her name by the Illinois State Police under the provisions of this Act."  *See* 430 ILCS 65/2(a)(1).

A separate statutory provision deals with *revocation* of FOID cards.  *See* 430 ILCS 65/9.5.  Under that provision, individuals whose FOID cards have been revoked must, within 48 hours of notice of revocation, surrender their FOID cards to the police.  *See* 430 ILCS 65/9.5(a)(1).  Also within 48 hours of notice of revocation, an individual with a revoked FOID

card must complete a Firearm Disposition Record, listing the model, make and serial number of each firearm he owns, where the firearm(s) will be kept during the prohibited term, and the name of the person to whom the firearm(s) will be transferred (if they are being transferred). *See* 430 ILCS 65/9.5(a)(2).

The Illinois State Police emailed Ochoa about the change in his FOID status on the morning of September 8. And Ochoa was arrested on the evening of September 10. So, more than 48 hours passed from the email notice until the time of the arrest. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 57 (Dckt. No. 45). But again, the email told Ochoa that his status had changed, without expressly saying that his status was revoked.

Officers Muro and Martinez knew that Ochoa's FOID card was revoked. But they did not know when it was revoked. They did not know whether the card was revoked within the past 48 hours. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 18 (Dckt. No. 53).

In fact, Officer Martinez testified that he did not know that the FOID statute included a 48-hour grace period. *Id.* at ¶ 34; *see also* Martinez Dep., at 58–59 (Dckt. No. 47-1, at 17 of 37). Officer Martinez also testified that he or Officer Muro "would have looked up" the statute cited in the criminal complaint – meaning 430 ILCS 65/2(a)(1). *See* Martinez Dep., at 58.

Officer Martinez testified that one of the two officers would have looked at the statute when they filed the complaint charging Ochoa with a misdemeanor:

> Q:    Now, it cites a specific statute here, 430 ILCS 65/2-(a)-(1); do you see that?
>
> A:    I do.
>
> Q:    Would you and/or Muro have looked up the statute?
>
> A:    Yes.
>
> Q:    Do you recall which one or both of you?

25

A:      No.  I – I don't recall.

Q:      But do you know that that happened?

A:      Yes.

Q:      All right.  And the entire statute would have been
        read, correct, not just that section of it?

A:      Yes.

*Id.*

Based on that exchange, Ochoa contends that Officer Martinez admitted that he and Officer Muro "read the entire statute before jointly deciding to charge [Ochoa] with violating that criminal statute."  *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 34 (Dckt. No. 53).

Defendants point out that Ochoa's attorney referred to a particular statutory subsection, meaning 430 ILCS 65/2(a)(1), as the "statute."  So Officer Martinez may not have understood that the question to be asking about the statute as a whole.  *Id.*  Even so, the last question did refer to the "entire statute."

The criminal complaint cites only 430 ILCS 65/2(a)(1).  *See* Crim. Cplt. (Dckt. No. 47-2).  Ochoa does not point to any other evidence, apart from Officer Martinez's testimony, that suggests that Officers Muro and Martinez read the entire statute.  *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 34 (Dckt. No. 53).

After the arrest, Officers Muro and Martinez drove to the police station with Ochoa in the back, arriving at about 10:36 p.m.  *See* Muro Video #2, at 37:10 – 38:00 (Dckt. No. 40-7).  Ochoa was released at 6:50 a.m. the next morning, according to the arrest report.  *See* Arrest Report (Dckt. No.53-5 at 2 of 6).  Doing the math, Ochoa spent about eight hours in jail.

That length of time is roughly consistent with the initial estimate that Ochoa gave in his interview with the Civilian Office of Police Accountability. *See* COPA Interview, at 5:20-25.[8] At deposition, Ochoa estimated the time that he was "in jail" as "give or take 12, 13 hours." *See* Ochoa Dep., at 119:3-10 (Dckt. No. 47-4, at 32 of 54).

On the morning of September 11, 2021, Ochoa was released on $150 bond. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 77 (Dckt. No. 45).

Former Illinois Assistant State's Attorney Trevor Rogers was the prosecutor who handled Ochoa's case. *Id.* at ¶ 80. Rogers does not know Officer Muro or Officer Martinez and "d[id] not recall speaking to them regarding plaintiff's prosecution." *Id.*

A court hearing took place on November 9, 2021. *See* 11/9/21 Tr., at 1 (Dckt. No. 47-5). Officers Muro and Martinez were not in court, so ASA Rogers requested a continuance. *Id.* at 2:2-6. The judge denied his request. *Id.* at 2:7. The charge was stricken with leave to reinstate. *See* Rogers Dep., at 17:1-10 (Dckt. No. 40-12).

The criminal charge against Ochoa was not resolved by plea negotiation, agreement, or compromise between Ochoa and a prosecuting attorney. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 38 (Dckt. No. 53).

## V.    Civilian Office of Police Accountability (COPA) Complaint

On November 17, 2021, roughly two months after the arrest, Ochoa filed a complaint against Officers Muro and Martinez with the Civilian Office of Police Accountability ("COPA"). *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 66 (Dckt. No. 45). Ochoa sat for an interview with COPA investigators, and recounted what happened. *See generally* COPA Interview.

---

[8] Ochoa's interview with the Civilian Office of Police Accountability was filed under seal. *See* 10/3/23 Order (Dckt. No. 56). So, it does not appear on the public docket.

During the interview, Ochoa said that he told Officers Muro and Martinez, "OK, that's fine," when they said that a sergeant would come serve him with the order of protection. *Id.* at 3:00-15.

Ochoa acknowledged that after the sergeant left, the two officers asked whether they could pick up the firearms from his house. He explained that he said "yes, of course" because "that is what you are supposed to do as soon as you get served. You are supposed to turn in your firearms, which I have done before." *Id.* at 3:30-50; *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 68 (Dckt. No. 45). Ochoa said that Officers Muro and Martinez were "very helpful" and wished him "good luck" with his situation. *See* COPA Interview, at 4:00-15.

Ochoa told the COPA investigators that he heard a knock on the door about five minutes after the officers collected the firearms. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 69–70 (Dckt. No. 45). It was the police officers. *Id.* at ¶ 70. Ochoa told the COPA investigators that he initially thought the officers wanted to "give him some advice or something." *See* COPA Interview, at 4:25-30.

Ochoa told the investigators that, after the arrest, he researched the law. He learned about the FOID statute's 48-hour grace period to turn in firearms. *Id.* at 6:07-30.

Ochoa complained to the investigators that the officers "didn't even bother finding out" about the 48-hour window before arresting him and "leaving [him] in a cell for hours without telling [him] anything." *Id.* at 6:20-31. Still, Ochoa said the officers "were being kind and trying to make sense of the whole thing." *Id.* at 6:30-37.

The COPA investigator asked if Ochoa "gave [the officers] permission to come in and get the guns." *Id.* at 9:40-46. Ochoa replied: "*Yeah, I was fully compliant* because I know that's what you have to do. And I have no reason to hide anything. So, I said '*Yeah, of course you can*

28

*come in.*' It makes it easier for me so I do not have to call you guys another day and have you come out." *Id.* at 9:46-57 (emphasis added); *see* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 74 (Dckt. No. 45).

The COPA investigator asked Ochoa: "What is your complaint about what the officers did?" *See* COPA Interview, at 12:00-17. Ochoa responded that he "shouldn't have been arrested," and that the officers were uninformed about the 48-hour grace period. *Id.* at 12:17-43. Ochoa also thought it was "unprofessional" of Officer Martinez to tell his mother that he wasn't being arrested, only to later say that he was being arrested. *Id.* at 14:00-38.

Ochoa said that when he arrived at the police station, the officers "were trying to be nice" but "treated [him] how you would treat a prisoner." *Id.* at 16:25-38. He described the experience as "humiliating." *Id.* at 17:00-10.

The record does not reveal what came of the COPA investigation.

## VI. This Lawsuit

Ochoa later sued Officer Muro, Officer Martinez, and the City of Chicago. He later amended the complaint, and the operative complaint includes four counts. *See* Am. Cplt., at ¶¶ 29–55 (Dckt. No. 31).

The complaint is about what happened at Ochoa's apartment. That is, the factual allegations in the amended complaint refer only to events that occurred at Ochoa's residence, *not* to what happened on the street outside Rodriguez's residence. *Id.* at ¶¶ 7–28.

The first three claims allege violations of the Fourth Amendment under 42 U.S.C. § 1983. *See id.* at ¶¶ 29–42. Counts I, II, and III are against Officers Muro and Martinez, but not the City. *Id.*

29

Count I is an unreasonable seizure claim. *Id.* at ¶¶ 29–31. But there is some disconnect between the allegations of the complaint and the content of Ochoa's brief. In the complaint, Ochoa alleges that he was seized at his home. *Id.* at ¶ 9. In his brief opposing summary judgment, Ochoa contends that he was seized on the street – *i.e.*, about a block away from Rodriguez's home – and that this seizure was an unconstitutional *Terry* stop. *See* Pl.'s Resp. in Opp. to Defs.' Mtn. for Summ. J., at 2–4 (Dckt. No. 48).

Count II is an unconstitutional entry/search claim. *See* Am. Cplt., at ¶¶ 32–34 (Dckt. No. 31). And Count III alleges unreasonable pretrial detention.[9] *Id.* at ¶¶ 35–42.

Count IV is a state-law malicious prosecution claim against Officer Muro, Officer Martinez, and the City. *Id.* at ¶¶ 43–55.

After discovery, Defendants moved for summary judgment on all counts. *See* Defs.' Mtn. for Summ. J. (Dckt. No. 39). Defendants argue that each of Ochoa's claims fails on the merits. *Id.* at 1. Officers Muro and Martinez also argue that they are entitled to qualified immunity on the Fourth Amendment claims. *See* Defs.' Mem. in Support of Mtn. for Summ. J., at 11 (Dckt. No. 41).

---

[9] In Ochoa's brief opposing the motion for summary judgment, he oscillates between referring to Count III as an "unreasonable pretrial detention" claim and as a "malicious prosecution" claim. *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 8–11 (Dckt. No. 48). In the past, the Seventh Circuit has made clear that "'Fourth Amendment malicious prosecution' is the wrong characterization. There is only a Fourth Amendment claim – the absence of probable cause that would justify the detention." *Manuel v. City of Joliet*, 903 F.3d 667, 670 (7th Cir. 2018). Put differently, "[t]he Seventh Circuit ma[de] clear that the Fourth Amendment protects against unreasonable searches and seizures in the absence of probable cause – not against some right not to be prosecuted without probable cause." *Louden v. Carter*, 2021 WL 5882163, at *4 (N.D. Ill. 2021). However, the Supreme Court has recently recognized a Fourth Amendment claim for malicious prosecution (also known as a "claim for unreasonable seizure pursuant to legal process"). *See Thompson v. Clark*, 596 U.S. 36, 42 (2022). In any event, this distinction is immaterial for purposes of assessing Defendants' summary judgment motion. To simplify things, the Court will refer to Count III as a "pretrial detention" claim, only.

**Legal Standard**

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving him the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "[A] video record of the events at issue can evaporate any factual dispute that would otherwise exist, as courts view the 'facts in the light depicted by the videotape.'" *United*

*States v. Norville*, 43 F.4th 680, 682 (7th Cir. 2022) (quoting *Scott*, 550 U.S. at 381). "Video evidence, however, can eviscerate a factual dispute only when the video is so definitive that there could be no reasonable disagreement about what the video depicts. . . . It should be considered a rare case where video evidence leaves no room for interpretation by a fact finder." *Kailin v. Vill. of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023).

## Analysis

Before diving in, the Court needs to clear up an issue that arose during summary judgment briefing. Ochoa's response brief alleged a brand-new claim, which threw Defendants for a loop.

The amended complaint alleges that the officers violated the Fourth Amendment inside Ochoa's apartment. *See* Am. Cplt., at ¶¶ 7–20, 29–31 (Dckt. No. 31). The factual allegations begin with a description of Ochoa inside his home. Ochoa claims that he was "lawfully located" at his home address on September 10, 2021. *Id.* at ¶ 7. The complaint alleges that, "on that day and place," Officers Muro and Martinez "seized" him. *Id.* at ¶ 9. Likewise, "on that day and place," Officers "Muro and Martinez did not possess legal cause to seize" Ochoa. *Id.* at ¶ 10.

But Ochoa's response brief frames Count I as a *Terry* stop claim about what happened on the street outside Rodriguez's apartment, after the police started asking him about his firearms. *See* Pl.'s Resp. in Opp. to Defs.' Mtn. for Summ. J., at 2–4 (Dckt. No. 48). That interaction took place before the police drove with Ochoa to his apartment. It is a claim about a different place, at a different time.

Ochoa acknowledges that his initial encounter with police was consensual. After all, Ochoa called *them*. But as Ochoa sees it, the encounter turned into an unconstitutional seizure "when Defendants rejected his request to leave." *Id.* at 3.

Ochoa points out that he asked Officers Muro and Martinez whether he could leave the scene and be served with the order of protection later, instead of waiting for a sergeant to arrive. Officer Martinez replied, "We're here now. It's all on camera." *Id.*

Defendants believe that Ochoa's *Terry* stop claim is a late-breaking addition to the case, raised for the first time in response to the summary judgment motion. *See* Defs.' Mem. in Support of Mtn. for Summ. J., at 3 (Dckt. No. 41). The Court agrees.

A complaint need not pin down a precise legal theory. *See Joseph v. Elan Motorsports Techs. Racing Corp.*, 638 F.3d 555, 561 (7th Cir. 2011). But a complaint must provide "enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests . . . ." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008) (citations omitted).

Notice pleading requires fair notice, and fair notice means advance warning. A defendant needs to know what a claim is about. Notice pleading requires more than a message of "you've been sued," with the nature and the basis for the claim TBD.

The Federal Rules require fair notice for good reason. A defendant is entitled to know what it is defending against. Knowing the nature of the claim helps to frame a party's defenses, from beginning to end. A complaint is an opening salvo, and it also creates a fat target for defendants. It gives them something to prepare for, and something to shoot at.

That need to know is especially important when it comes to discovery. Counsel take discovery based on the claims that are on the table. The nature of the claims helps to frame what questions to ask at deposition, what documents to request, and what topics to explore. A lot of mental energy goes into defending a lawsuit. Anyone who has gone through discovery understands the importance of knowing the lay of the land.

Unveiling a new theory at the summary judgment stage is more than a little jarring for the other party. It creates surprise, chaos, confusion, and uncertainty. A party that has spent months thinking about a case and gathering evidence should not have to learn at the last minute that the case is about something else. A hide-the-ball, move-the-goalposts, bait-and-switch approach to litigation isn't what the Federal Rules have in mind. *See* Fed. R. Civ. P. 1.

Surprise is unnecessary, too, given the clear road for amendments. The Federal Rules give plaintiffs wide latitude when it comes to amending complaints. The process is straightforward. A party may amend the complaint by filing a motion for leave to amend under Rule 15, and district courts must "freely give leave when justice so requires." *See* Fed. R. Civ. P. 15(a)(2). The road for amendments under Rule 15 is wide open. Amending a complaint in a response brief under Rule 56 is the wrong way to go.

For those reasons, "a plaintiff may not use her brief opposing summary judgment to introduce claims not stated in her complaint." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 693 (7th Cir. 2010); *see also Conner v. Illinois Dep't of Nat. Res.*, 413 F.3d 675, 680 (7th Cir. 2005) (affirming district court's refusal to allow claim first raised in response to summary judgment).

A plaintiff cannot, in response to a brief opposing summary judgment, "introduce a new factual basis not previously presented in the pleadings for a claim." *Whitaker v. Milwaukee Cnty.*, 772 F.3d 802, 808 (7th Cir. 2014); *see also Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017) ("When a new argument is made in summary judgment briefing . . . [and] it changes the complaint's factual theory . . . the plaintiff may be attempting in effect to amend its complaint, and the district court has discretion to deny the *de facto* amendment and to refuse to consider the new factual claims.").

34

The story told by the complaint starts when Ochoa returned to his home, meaning *after* the events that took place on the street on Rodriguez's block. In other words, the complaint starts *in medias res* – in the middle of the story – with Ochoa at home.

The complaint does not even mention that Ochoa encountered Officers Muro and Martinez on the street earlier that evening. The complaint does not mention what happened before the officers got to Ochoa's house at all. So, it does not provide Defendants with fair notice about a potential claim based on the events that occurred on the street, outside Rodriguez's house.

Ochoa's *Terry* stop claim raises a new set of facts. The complaint does not mention the words "*Terry* stop," or anything along those lines. The lack of phraseology is unimportant, because a complaint does not have to contain magic words. But the substance is important. And here, the complaint did not give notice that the interaction on the street gave rise to a Fourth Amendment claim. Ochoa did not allege a *Terry* stop claim until he filed his response to the motion for summary judgment.

"This is too late in the day to be adding new claims." *Auston v. Schubnell*, 116 F.3d 251, 255 (7th Cir. 1997). A *Terry* stop claim is new, and draws on facts beyond the scope of the complaint. Allowing the claim to proceed would be unfair to Defendants. So, Count I is dismissed to the extent that it is about a *Terry* stop.

With that windup, the Court will consider whether the claims alleged in the complaint survive summary judgment. The Court will start with whether Defendants are entitled to qualified immunity on the three Fourth Amendment claims (Counts I, II, and III). The Court will then discuss the state-law claim (Count IV).

I.      **Qualified Immunity for the Fourth Amendment Claims (Counts I, II, & III)**

The first three claims allege violations of the Fourth Amendment.  *See* Am. Cplt., at

¶¶ 29–34 (Dckt. No. 31).  Count I is about the seizure of Ochoa at his home.  *Id.* at ¶¶ 29–31.

Count II is about the two entries into the apartment, plus the search that followed.  *Id.* at ¶¶ 32–

34.  Count III is about the pretrial detention.  *Id.* at ¶¶ 35–42.

Qualified immunity protects government officials when they exercise discretionary

functions.  *See Roldan v. Stroud*, 52 F.4th 335, 337 (7th Cir. 2022) (citing *Mitchell v. Forsyth*,

472 U.S. 511, 526 (1985)).  Qualified immunity is a "doctrine designed to protect public officials

from the effects of guessing wrong in a world of legal uncertainty."  *See Anderson v. Cornejo*,

355 F.3d 1021, 1022 (7th Cir. 2004).

Not every public official has the benefit of sitting back in an office, with a cup of coffee

in hand, trying to figure out the right answer to a complex legal question with the luxury of time.

Some public servants have to do the best they can, in the heat of the moment, when faced with

real-world situations and very human interactions.  For the rest of us, the closest we get to the

heat of the moment is the nearby caffeination.

Not everyone has the time or the luxury of hopping on Westlaw.  Sometimes life happens

right in front of you, then and there, and you have to make a call on the spot.  That's especially

true when public safety is at issue.  Qualified immunity reflects that reality.

State officials "are entitled to qualified immunity under § 1983 unless (1) they violated a

federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly

established at the time.'"  *District of Columbia v. Wesby*, 583 U.S. 48, 138 (2018) (quoting

*Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  "These questions may be addressed in either

order." *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021). "If *either* inquiry is answered in the negative, the defendant official is protected by qualified immunity." *Id.* (emphasis in original).

Qualified immunity is a burden-flipping affirmative defense. "Qualified immunity is an affirmative defense, but once the defendant raises it, 'the burden shifts to the plaintiff to defeat it.'" *Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021); *Sebesta v. Davi*s, 878 F.3d 226, 233 (7th Cir. 2017) ("Though it is an affirmative defense for pleading purposes, the plaintiff carries the burden of showing that defendants are not immune."); *Abbott v. Sangamon County*, 705 F.3d 706, 723 (7th Cir. 2013) ("Once a defendant raises the defense of qualified immunity, the plaintiff bears the burden of defeating it.").

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *See* U.S. Const. amend. IV. "The 'seizure' of a 'person' plainly refers to an arrest." *Torres v. Madrid*, 592 U.S. 306, 312 (2021). The key word in the Fourth Amendment is "unreasonable." "[T]he ultimate touchstone of the Fourth Amendment is reasonableness." *Kentucky v. King*, 563 U.S. 452, 459 (2011) (internal quotation marks omitted).

Defendants contend that they are entitled to qualified immunity on the unreasonable seizure claim (Count I) and the unlawful pretrial detention claim (Count III) because they had probable cause to believe that Ochoa violated the FOID statute. *See* Defs.' Mem. in Support of Mtn. for Summ. J., at 11–13 (Dckt. No. 41). They believe that they are entitled to qualified immunity on the claim about the entries into the apartment and the search (Count II) because they reasonably believed that Ochoa had consented. *Id.* at 13.

The Court will first consider the existence of probable cause, and then consent.

### A.    Probable Cause for the Seizure, and the Detention (Counts I and III)

Defendants argue that they had probable cause to believe that Ochoa violated the law. That is, they had probable cause to believe that Ochoa possessed an illegal firearm (an assault weapon), and possessed firearms without a valid FOID card. As they see it, that probable cause justified the seizure (Count I) and the pretrial detention (Count III). *See* Defs.' Mem. in Support of Mtn. for Summ. J., at 11–13 (Dckt. No. 41).

Probable cause means that "facts and circumstances within the officer's knowledge [] are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *United States v. Slone*, 636 F.3d 845, 849 (7th Cir. 2011) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). "[P]robable cause is an absolute defense to claims under section 1983 against police officers for an allegedly unreasonable seizure, whether a false arrest or a wrongful pretrial detention." *Norris v. Serrato*, 761 F. App'x 612, 615 (7th Cir. 2019); *see also Young v. City of Chicago*, 987 F.3d 641, 644 (7th Cir. 2021).

Probable cause "is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Doe v. Gray*, 75 F.4th 710, 719 (7th Cir. 2023) (citations omitted). An officer doesn't have to be *right* to have probable cause. After all, that's why it's called *probable cause*.

An officer can get qualified immunity even if there was no probable cause. Under the "clearly established" prong, an officer is entitled to qualified immunity if "a reasonable officer could have mistakenly believed that probable cause existed." *Fleming v. Livingston Cnty.*, 674 F.3d 874, 878 (7th Cir. 2012). Put differently, an officer only needs to have "arguable probable cause" for qualified immunity to apply. *See Thayer v. Chiczewski*, 705 F.3d 237, 247 (7th Cir.

2012).  An arrest does not violate a "clearly established" constitutional right if there was arguable probable cause.  *See Abbott v. Sangamon Cnty.*, 705 F.3d 706, 715 (7th Cir. 2013).

"Probable cause to arrest [*i.e.*, probable cause for an unreasonable seizure claim] exists when the facts and circumstances that are known to the officer reasonably support a belief that the individual has committed, is committing, or is about to commit a crime."  *Braun v. Vill. of Palatine*, 56 F.4th 542, 548 (7th Cir. 2022) (cleaned up).  "And because probable cause is an objective standard, [an] arrest [is] lawful if [the officer] had probable cause to arrest [the arrestee] for any offense, regardless of the reason the police were called or the reason given for the arrest."  *Norris v. Serrato*, 761 F. App'x 612, 615 (7th Cir. 2019) (cleaned up).

Probable cause for the purposes of a pretrial detention claim is similar.  "[A] pretrial detention is a 'seizure' – both *before* formal legal process and *after* – and is justified only on probable cause."  *Williams v. Martinez*, 2023 WL 6141494, at *4 (N.D. Ill. 2023) (cleaned up) (quoting *Lewis v. City of Chicago*, 914 F.3d 472, 477 (7th Cir. 2019)) (emphasis in original).

The detention itself – rather than the criminal charges – must be justified by probable cause.  *See Lewis*, 914 F.3d at 477; *Manuel v. City of Joliet*, 903 F.3d 667, 670 (7th Cir. 2018); *Artman v. Gualandri*, 2021 WL 2254961, at *3 (N.D. Ill. 2021).  A pretrial detention claim exists where there is "the absence of probable cause that would justify the detention. . . . The problem is the wrongful custody."  *Manuel*, 903 F.3d at 670.

Officer Muro and Officer Martinez had probable cause to arrest Ochoa.  When the officers spoke with Ochoa on the street – before they planned to arrest him – Ochoa told them that he owned an assault rifle.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 25 (Dckt. No. 45).  A City of Chicago ordinance barred residents from owning assault rifles.  *See* Chicago Mun. Code §§ 8-20-010(a)(10)(B), 8-20-075, 8-20-085.

So, Ochoa admitted to the officers that he violated the municipal code. The officers had probable cause to believe that Ochoa broke a Chicago ordinance, because *he told them he did*.[10] *See, e.g.*, *United States v. Hillard*, 70 F. App'x 889, 891 (7th Cir. 2003) (concluding that police had probable cause to arrest an individual who was driving with no license and admitted to carrying a concealed weapon); *United States v. Finke,* 85 F.3d 1275, 1282 (7th Cir. 1996) (opining that reasonable suspicion turned into probable cause when suspect "admitted that there was 'pot' in the car, and a pat down search" revealed a "roach clip"). If anything, it's hard to beat an admission.

The lack of a FOID card gave the officers a second, independent basis for arresting Ochoa. *See* Defs.' Joint Reply in Support of Mtn. for Summ. J., at 8 (Dckt. No. 54). Before arresting Ochoa, the officers saw that Ochoa was in possession of firearms and related items regulated by the FOID Act. *Id.* Then, the officers ran Ochoa's FOID card through the computer system, which showed that the card was revoked. *Id.*

So, Ochoa had a double-barreled problem. He wasn't supposed to have *that* weapon (the assault weapon). And he wasn't supposed to have *any* weapons (because he lacked a FOID card). That's probable cause, times two.

Ochoa argues that the officers lacked probable cause because they did not know when the FOID card was revoked, or if Ochoa had received notice of the FOID revocation more than 48 hours before the arrest. *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 10 (Dckt. No. 48). The officers did not take steps to find out when the FOID card was revoked, either. *Id.*

---

[10] Indeed, in his brief opposing Defendants' motion for summary judgment, Ochoa concedes that "at the point in time Defendants subjected Plaintiff to a custodial arrest, they did have arguable probable cause to believe that Plaintiff's possession of a legally purchased 'AR style' long gun violated a City of Chicago ordinance." *See* Pl.'s Resp. in Opp. to Defs.' Mtn. for Summ. J., at 11 n.1 (Dckt. No. 48).

As a reminder, after a FOID card holder has notice of revocation, he has up to 48 hours to surrender his weapons. *See* 430 ILCS 65/9.5(a)(1). The Illinois State Police sent an email to Ochoa about a change to his FOID status more than 48 hours before Ochoa called Officers Muro and Martinez. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 57 (Dckt. No. 45). But that email simply said that the FOID status was *changed* – not that the FOID was *revoked*.

The parties dig into a bit of a rabbit hole about what Ochoa knew, and when he knew it. According to Illinois State Police website logs, Ochoa looked at the site with information about the change in his FOID status five times (in fewer than seven minutes) after getting that email. *See* Ochoa Dep., at 48:1 – 50:20 (Dckt. No. 47-4, at 14–15 of 54). But Ochoa contends that he could not access the site. *Id.* at 46:8 – 50:16.

At the time of the arrest, Ochoa and the officers debated why the FOID was revoked. Ochoa claimed that his FOID was revoked "because of this," meaning because of the order of protection. Officer Martinez replied: "That is the thing. We don't know if it is because of this. It just says 'Revoked.'" *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 60 (Dckt. No. 45).

The record is mixed about whether Officers Muro and Martinez knew about the 48-hour grace period. Officer Martinez testified that he did not know about the grace period. *See* Martinez Dep., at 58–59 (Dckt. No. 47-1, at 17 of 37). But Officer Martinez also testified that either he or Officer Muro would have read the "entire" FOID statute before charging Ochoa. *Id.*

Putting it all together, the undisputed facts show that Officers Muro and Martinez did not know *when* the FOID was revoked. They did not know *why* the FOID was revoked. They simply knew that Ochoa had a revoked FOID card. And they *might* have known that, after revocation, a FOID card holder has 48 hours to turn over his card.

That rabbit hole is a dead end. At bottom, Ochoa believes that the police should not have arrested him because they should have done more to figure out that he did not violate the statute. That is, they should have figured out that his FOID card was revoked because of the order of protection, and they should have figured out the grace period, too.

Again, probable cause is a low bar. *See Kaley*, 571 U.S. at 338. Reasonableness is key. The officers did not need to run down all leads, and eliminate any possibility of non-wrongdoing. *See Hernandez v. Sheahan*, 455 F.3d 772, 775 (7th Cir. 2006) ("[P]robable cause . . . is well short of certainty. Like a grand jury, police may act on the basis of inculpatory evidence without trying to tote up and weigh all exculpatory evidence.") (citation omitted); *see also Burritt v. Ditlefsen*, 807 F.3d 239, 251 (7th Cir. 2015) ("Law enforcement is not required to discover more information to undermine probable cause once it has been established.").

And here, based on the undisputed facts, the officers had probable cause to arrest and detain Ochoa for a violation of the FOID Act. The officers saw inculpatory evidence – a revoked FOID card – and they acted on it. They were not required to look into whether Ochoa had notice, or why the card was revoked.

Ochoa digs into another rabbit hole about his truthfulness. Ochoa claims that "[the officers] did not have any information that [he] was being untruthful with them when he indicated he was not aware the FOID card had been revoked." *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 11 (Dckt. No. 48).

The Court disagrees. Ochoa was less than forthcoming about how many firearms he owned. He kept upping the ante on the number, before fessing up to owning an automatic rifle (in violation of a municipal ordinance). *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 25 (Dckt. No. 45). A reasonable officer could have inferred that Ochoa was also lying about his

FOID status. *See Williamson v. Curran*, 714 F.3d 432, 441 (7th Cir. 2013) (opining that an officer need not accept suspect's denial of wrongdoing); *Reynolds v. Jamison*, 488 F.3d 756, 762 (7th Cir. 2007) (explaining that suspect's denial of wrongdoing does not negate probable cause).

More importantly, the police did not have to run all leads to the ground, and figure out if Ochoa was telling the truth. The basis for an arrest was straightforward. Ochoa owned firearms, and he didn't have a valid FOID card. So they had probable cause to arrest him, regardless of the story that he was telling.

Besides, even if the officers lacked actual probable cause to arrest and detain Ochoa under the FOID Act, they had *arguable* probable cause, and thus enjoyed qualified immunity. Defendants lean on two cases for support, both of which involved revoked FOID cards. *See* Defs.' Mem. in Support of Mtn. for Summ. J., 11–13 (Dckt. No. 41).

In *Lipford v. City of Chicago*, Judge Blakey concluded that officers had probable cause to believe that the plaintiff "violated the FOID Card Act when he admitted to possessing [] firearms and ammunition in his bedroom, but could not produce a FOID card upon request." *See Lipford v. City of Chicago*, 2018 WL 1156242, at *4 (N.D. Ill. 2018).

In *Robinson v. Cook County*, Judge Dow dismissed a suit where a plaintiff alleged that "his FOID card was illegally revoked and that Defendants should have known that his right to carry a firearm was never restricted." *See Robinson v. Cook Cnty.*, 2021 WL 365770, at *5 (N.D. Ill. 2021). The complaint alleged that the plaintiff informed the officers that he did not know about the order of protection under which his FOID was allegedly revoked. *Id.* Judge Dow concluded that this allegation was insufficient to show that the defendants lacked probable cause. *Id.*

43

Ochoa argues that the two cases are "easily distinguishable." In his view, *Lipford* is distinguishable because Ochoa "produced his FOID card to Defendants upon request," whereas the *Lipford* plaintiff did not have a FOID card at the ready. *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 13 (Dckt. No. 48). Ochoa thinks *Robinson* is different than his case because Officers Muro and Martinez "knew that [Ochoa] had not received notice of his FOID revocation." *Id.*

The Court acknowledges that the facts in *Lipford* and *Robinson* are not *exactly* the same as the facts in the case at hand. But the differences are immaterial to the question of arguable probable cause.

Ochoa did have a FOID card, but when the officers ran that card, they discovered that it was revoked. So, he had a FOID card, but he didn't have a *valid* FOID card. Both Ochoa and the *Lipford* plaintiff lacked valid FOID cards. So, *Lipford* suggests that the officers had at least arguable probable cause for the arrest.

*Robinson* lends a hand to the officers, too. Officers Muro and Martinez did not *know* that Ochoa lacked notice of the revocation. While arresting Ochoa, Officer Martinez stated: "We don't know if it [*i.e.*, the revocation] is because of this [*i.e.*, the order of protection]. It just says 'Revoked.'" *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 60 (Dckt. No. 45). The officers might have guessed that Ochoa's card was revoked because of the order of protection, but they did not know for sure.

And to the extent that Officers Muro and Martinez assumed that Ochoa's FOID was revoked because of the order of protection, they did not know whether Ochoa had notice. True, they knew that Sergeant Casale had served Ochoa earlier that night. But they did not know whether Ochoa had accessed information about the revoked FOID before he was served.

Based on *Lipford* and *Robinson*, Officers Muro and Martinez had arguable probable cause to arrest and detain Ochoa for violating the FOID statute. Even if they lacked actual probable cause, Officers Muro and Martinez did not run afoul of clearly established law by arresting Ochoa.

In sum, Officers Muro and Martinez had probable cause to arrest Ochoa for violating a municipal ordinance. The officers had probable cause to arrest Ochoa (and detain him overnight) for violating the FOID Act, too. At the very least, they had arguable probable cause. Therefore, Officers Muro and Ochoa are entitled to qualified immunity for Counts I and III.

### B. Unconstitutional Entry and Search (Count II)

The next claim is about the entry by the officers into Ochoa's apartment (twice), plus the search for the weapons. Officers Muro and Martinez contend that Ochoa gave his consent for the two entries into his home, and for the search that followed. And to the extent that there is any doubt, they argue that they had qualified immunity.

A "basic principle" of Fourth Amendment law is that searches "inside a home without a warrant are presumptively unreasonable." *See Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (internal quotation marks omitted). "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Courts look at the "totality of the circumstances to determine whether a search is reasonable within the meaning of the Fourth Amendment." *Samson v. California*, 547 U.S. 843, 848 (2006) (cleaned up).

"Consent is a well-recognized exception to the Fourth Amendment's warrant requirement." *United States v. Jones*, 22 F.4th 667, 675 (7th Cir. 2022) (citing *Schneckloth v.*

*Bustamonte*, 412 U.S. 218, 219 (1973)).  "Explicit verbal consent" is not required – consent can be verbal or non-verbal.  *See United States v. Villegas*, 388 F.3d 317, 324 (7th Cir. 2004).

The consent inquiry is objective, and it goes back to the constitutional touchstone of "reasonableness."  "[T]he question is whether the police officers had a reasonable belief that they had consent to enter, even if that belief was mistaken."  *Lietzow v. Vill. of Huntley*, 2023 WL 2954989, at *8 (N.D. Ill. 2023); *see also Ohio v. Robinette*, 519 U.S. 33, 34 (1996).

Put differently, "[t]he consent inquiry focuses on 'what is reasonably apparent to a reasonable inquiring officer.'"  *United States v. $304,980.00 in U.S. Currency*, 732 F.3d 812, 819 (7th Cir. 2013) (quoting *United States v. Grap*, 403 F.3d 439, 444 (7th Cir. 2005)).

 "It [is] clearly established that an individual manifests consent to search only if an objective observer would understand the actions to mean consent, and that the consent must be voluntary, considering the totality of the circumstances."  *Dantzler v. City of Chicago*, 2013 WL 707879, at *5 (N.D. Ill. 2013); *see also Lovi v. Vill. of Arlington Heights*, 62 F. Supp. 3d 756, 767 (N.D. Ill. 2014).

The Seventh Circuit looks to the following factors in assessing the totality of the circumstances:  "(1) the age, education, and intelligence of the defendant; (2) whether he was advised of his constitutional rights; (3) how long he was detained before consenting; (4) whether he consented immediately or was prompted by repeated requests; (5) whether physical coercion was used; and (6) whether he was in custody when he consented."  *United States v. Thurman*, 889 F.3d 356, 367 (7th Cir. 2018) (citation omitted).

Officers Muro and Martinez did not have a search warrant.  Nevertheless, Defendants argue that the officers' search was reasonable, and Ochoa provided voluntary consent.  *See* Defs.' Mem. in Support of Mtn. for Summ. J., at 8 (Dckt. No. 41).

46

Ochoa contends that Defendants' arguments rely on disputed facts. *See* Pl.'s Resp., at 5 (Dckt. No. 48). He believes that both entries into his apartment – meaning when the officers followed him from Rodriguez's home, and when they returned to arrest him five minutes later – violated the Fourth Amendment. *Id.*

Because reasonableness depends on the totality of the circumstances, the Court needs to rewind the tape to Ochoa's interactions with the police in the street. It provides context.

Recall, the whole thing started with a consensual interaction, instigated by Ochoa. When the officers learned about his order of protection, the officers said that they needed to serve him. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 15, 16 (Dckt. No. 45). Ochoa asked if he could leave and get served later, and Officer Martinez replied, "So, we're here. It's all on camera." *Id.* at ¶ 17. Ochoa said that he understood. *Id.* Officer Martinez explained that he and Officer Muro planned to "go in" with Ochoa to his residence to grab Ochoa's guns. *Id.* at ¶ 18.

The officers then performed a consensual search of Ochoa's car, followed by a consensual search of Ochoa's person. *Id.* at ¶¶ 20, 21. So Ochoa called the police, and then he consented to a search (of his car), and then he consented to a second search (of his body).

Officer Martinez explained to Ochoa that the officers would have Ochoa point to his guns and ammunition, which the officers would then grab. *Id.* at ¶ 24. So, Ochoa knew about the officers' plan. So did Sargeant Casale.

Once Sergeant Casale showed up to serve Ochoa, Officer Martinez asked whether he and Officer Muro should get "all, the ammo, everything," and Sergeant Casale said yes. *Id.* at ¶ 29. When Sergeant Casale finished serving Ochoa, Officer Martinez again reiterated that he and Officer Muro planned to follow Ochoa to his home. *Id.* at ¶ 34.

When the officers arrived at Ochoa's apartment building, Ochoa opened the front door of the apartment building for the officers. *Id.* at ¶ 35. Officer Muro told Ochoa that he and Officer Martinez planned to follow Ochoa in, and Ochoa said that was "fine." *Id.* The officers followed Ochoa upstairs to his unit, where Ochoa opened the front door to his apartment. *Id.* at ¶ 38. Ochoa left the door half-open, and the officers followed him inside. *Id.*

When describing the encounter to the COPA investigators about two months later, Ochoa explained that the officers asked if they could get the firearms from his home. And in response, Ochoa told them "yes, of course," because "that is what you are supposed to do as soon as you get served. You are supposed to turn in your firearms, which I have done before." *See* COPA Interview, at 3:30-50.

Again, the COPA investigator asked if Ochoa "gave [the officers] permission to come in and get the guns." *Id.* at 9:40-46. Ochoa replied: "*Yeah, I was fully compliant* because I know that's what you have to do. And I have no reason to hide anything. So, I said '*Yeah, of course you can come in.*' It makes it easier for me so I do not have to call you guys another day and have you come out." *Id.* at 9:46-57 (emphasis added).

Officers Muro and Martinez left Ochoa's unit and returned about five minutes later. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 47 (Dckt. No. 45). Ochoa agreed to put his dog away (as he had earlier in the evening). *Id.* at ¶ 49. Ochoa then closed the door – either entirely or partly – and Officer Muro opened it, using just his fingertips. *Id.* at ¶¶ 50–51. Officer Martinez asked, "Good?" before the officers entered, and Ochoa seemingly said "Yeah." *Id.* at ¶ 51.

Based on the undisputed facts, the officers reasonably believed that they had consent to enter – even if their belief was mistaken. Ochoa admits that he never did anything to make Officers Muro and Martinez believe that they were unwelcome to enter his unit.

> Q:    Okay. And did you ever tell Officers Muro or Martinez
>        to not come in your house?
>
> A:    They said they were coming in.
>
> Q:    Okay. Did you tell them, "no, you're not coming in?"
>
> A:    No.
>
> Q:    Did you tell them to go get a warrant?
>
> A:    No.
>
> Q:    Okay. In fact, would you agree you were complying?
>
> A:    Yes.
>
> Q:    You agree you let them in?
>
> A:    They followed me and I didn't let them in.
>
> Q:    They followed you in but you did not let them in?
>
> A:    Yes.
>
> Q:    Okay. Did you do anything to indicate to these officers that
>        they were not welcome inside your home?
>
> A:    No.

*See* Ochoa Dep., at 97:15 – 98:8 (Dckt. No. 47-4, at 26–27 of 54).

True, Ochoa did not expressly tell Officer Muro and Officer Martinez that they could enter his unit. But that fact is not dispositive. *See United States v. Wesela*, 223 F.3d 656, 661 (7th Cir. 2000) ("The fact that there was no direct verbal exchange between Detective Corbett and Mrs. Wesela in which she explicitly said 'it's o.k. with me for you to search the apartment,'

is immaterial, as the events indicate her implicit consent."); *United States v. Walls*, 225 F.3d 858, 863 (7th Cir. 2000) (holding that trial court did not err in holding that defendant voluntarily consented to search where she "opened the door" and "stepped back" to let officers in and "motion[ed] for them to follow her to the kitchen" after they entered the residence).

Ochoa cooperated with the officers all the way. He knew that the officers planned to follow him to his house, and have him point to his weapons. He never objected to that plan. Ochoa heard the plan, and the officers heard no objection.

Plus, Ochoa asked Officers Muro and Martinez if he could put the dog in the bathroom before they entered. The whole point of moving the dog was to facilitate the entry by the police officers into his apartment. He cleared the *pooch* to make way for the *police*.

If Ochoa did not expect the officers to follow him up, it's hard to imagine why he would have asked to move his dog. *See Cardenas v. City of Chicago*, 2010 WL 2609866, at *4 (N.D. Ill. 2010) (pointing to a photograph inside the doorframe and stepping aside so that officer could enter unit could "only be interpreted as voluntary consent"); *United States v. Risner*, 593 F.3d 692, 695 (7th Cir. 2010) ("Although the entry had already occurred, [the defendant's girlfriend] obviously did not object to [the police officers'] presence given her desire that they remove the guns.").

To be sure, when Officer Muro and Officer Martinez returned to Ochoa's apartment a second time, Ochoa was more reluctant to put away the dog. The officers had to ask twice before he agreed to put the pooch in the bathroom. And Ochoa closed the door more firmly than he had the first time around.

Again, the Court must look at the totality of the circumstances. *See United States v. Grap*, 403 F.3d 439, 443 (7th Cir. 2005). And here, the totality of the circumstances would have

suggested to a reasonable officer that Ochoa consented to the second entry. He didn't tell the officers to go away, or lock the door, or refuse to move his dog, or tell them to get a warrant.

Officers Muro and Martinez established a rapport with Ochoa over the course of the evening. In fact, when Officer Muro and Officer Martinez first returned to Ochoa's apartment, he thought the officers wanted to "give him some advice or something." *See* COPA Interview, at 4:25-30. Ochoa had already consented to their entry once, and he agreed to put away his dog again. Those facts suggested to the officers that Ochoa consented to their entry. *See Forman v. Richmond Police Dep't*, 104 F.3d 950, 960 (7th Cir. 1997) (opining that officers would have believed they had valid consent to search a locked room while business operator "silently observed the police remove the door from its hinges"); *see also $304,980.00 in U.S. Currency*, 732 F.3d at 821.

More importantly, Officer Martinez asked if Ochoa was "good" before Officer Muro popped open the door. And the Court heard Ochoa reply: "yeah." A "yeah" would be explicit verbal consent.[11]

But even if Ochoa said "hold on," as he claims he did, no clearly established law prohibited the officers' entry. Defendants cite *Gerald M. v. Conneely*, which gets at this very proposition. *See* Defs.' Mem., at 9 (Dckt. No. 41) (citing *Gerald M. v. Conneely*, 858 F.2d 378, 384–85 (7th Cir. 1988)).

In *Gerald M.*, the homeowner did not verbally object to the officers' entrance, and she warned the officer about a puppy in her kitchen. *Gerald M.*, 858 F.2d at 385. She let in a single officer, who did not "threaten or intimidate her in any way." *Id.* While the home owner "said

---

[11] The statement "yeah" is additional evidence of consent, but it is not essential to the Court's holding. Based on this record, there is no genuine issue of material fact about whether a reasonable officer would believe that there was consent. This Court would reach the same conclusion, even if there were a fact question about whether Ochoa said "yeah."

'wait here' or something similar," that statement gave the Seventh Circuit "pause, but only for a moment." *Id.* at 384. The Seventh Circuit concluded that the statement was "well short of demonstrating that under the totality of the circumstances her consent was not voluntary." *Id.* at 385.

Defendants also cite *United States v. Villegas*, which likewise lends a hand. *See United States v. Villegas*, 388 F.3d 317, 325 (7th Cir. 2004); Defs.' Joint Reply in Support of Mtn. for Summ. J., at 19 (Dckt. No. 54).

In *Villegas*, officers knocked on Villegas's door and introduced themselves as law enforcement officers, and he let them in. *See Villegas*, 388 F.3d at 325. The officers never threatened Villegas or showed their weapons. *Id.* The Seventh Circuit held that he had "sufficiently manifested consent for the officers to enter his apartment." *Id.* Officers Muro and Martinez similarly introduced themselves as officers, and never threatened Ochoa or flashed their weapons.

For his part, Ochoa thinks *Dantzler v. City of Chicago* is more on point. *See* Pl.'s Resp., at 12–13 (Dckt. No. 48) (citing *Dantzler*, 2013 WL 707879, at *5). The plaintiff in *Dantzler* woke up to half a dozen marshals at her door, with their guns drawn. *See Dantzler*, 2013 WL 707879, at *5. The quantity of officers – and the suggestion of force – was enough to vitiate qualified immunity. The fact that the officers "follow[ed] . . . without asking permission to enter" was not. *See* Pl.'s Resp., at 13. So, *Dantzler* does not help Ochoa out.

Based on the Court's review of the record, Officers Muro and Martinez had plenty of reason to believe that Ochoa consented to their entry, regardless of whether Ochoa in fact consented. Thus, the officers enjoy qualified immunity on Ochoa's claim about the entry into the apartment, and the ensuing search for weapons.

In sum, Officers Muro and Martinez did not violate clearly established law when they entered Ochoa's residence (either time). Therefore, they are entitled to qualified immunity, and summary judgment, on Count II.

## II.    Malicious Prosecution (Count IV)

Count IV is a state-law malicious prosecution claim brought against Officer Muro, Officer Martinez, and the City of Chicago. *See* Am. Cplt., at ¶¶ 43–55 (Dckt. No. 31).

"To establish a claim for malicious prosecution under Illinois law, plaintiffs must establish five elements: (1) commencement or continuation of an original proceeding; (2) termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause; (4) malice; and (5) damages." *Cairel v. Alderden*, 821 F.3d 823, 834 (7th Cir. 2016) (citing *Sang Ken Kim v. City of Chicago*, 858 N.E.2d 569, 574 (Ill. App. Ct. 2006)). "The failure to establish any one element bars recovery." *Id.*

"Malicious prosecution is offense-specific," so the Court focuses its attention on the FOID Act charge. *Williams v. City of Chicago*, 733 F.3d 749, 759 (7th Cir. 2013).

Defendants contend that the malicious prosecution claim fails on two elements: probable cause and malice. *See* Defs.' Mem. in Support of Mtn. for Summ. J., at 13–15 (Dckt. No. 41). The Court does not need to address malice, because the claim falls apart at the probable cause prong.[12]

---

[12] Defendants did not move for summary judgment on element two (*i.e.*, termination of the proceeding in favor of the plaintiff). "In order to fulfill the second element, a plaintiff cannot predicate his [Illinois law] malicious prosecution action on underlying criminal proceedings which were terminated in a manner not indicative of the innocence of the accused." *Washington v. Summerville*, 127 F.3d 552, 557 (7th Cir. 1997). The criminal charge against Ochoa was dismissed with leave to reinstate. *See* Rogers Dep., at 17:1-10 (Dckt. No. 40-12). "[W]hen a charge has been stricken with leave to reinstate, the same charge may later be reinstated." *People v. Gill*, 886 N.E.2d 1043, 1047 (Ill. App. Ct. 2008). So, ASA Rogers could have brought the FOID Act charge again, if he wished to do so. Therefore, the proceedings don't appear to have "terminated in a manner . . . indicative of [Ochoa's] innocence." *Washington*, 127 F.3d at

"In a malicious prosecution action, probable cause is defined as a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Holt v. City of Chicago*, 214 N.E.3d 877, 900 (Ill. App. Ct. 2022) (internal quotation marks omitted). "For a malicious prosecution claim, probable cause is determined based upon the facts known to the prosecution at the time of filing, 'not the actual facts of the case or the guilt or innocence of the accused.'" *Cairel*, 821 F.3d at 834 (quoting *Sang Ken Kim*, 858 N.E. 2d at 574). "It is well established that the existence of probable cause forms a complete defense to a malicious prosecution claim." *Wade v. Collier*, 783 F.3d 1081, 1085 (7th Cir. 2015) (applying Illinois law).

The probable cause analysis for Count IV (the malicious prosecution claim under state law) is the same as the probable cause analysis about the FOID card. *See, e.g.*, *Zhang v. Schuster*, 2022 WL 615015, at *23 (N.D. Ill. 2022). Officers Muro and Martinez had probable cause to arrest Ochoa for a violation of the FOID Act. Therefore, Ochoa's state-law malicious prosecution claim necessarily fails. Defendants are entitled to summary judgment on Count IV.

### Conclusion

For the reasons stated above, Defendants' motion for summary judgment is hereby granted.

Date: March 11, 2024

Steven C. Seeger
United States District Judge

---

557. Element two thus may offer a separate ground warranting dismissal of Ochoa's malicious prosecution claim.

54